## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TRACY HEINRICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12-CV-4352 |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Tracy Heinrich, seeks judicial review of a final decision by the Commissioner of

the Social Security Administration ("SSA") denying her application for a period of disability and

disability insurance benefits under the Social Security Act ("the Act").[1] Ms. Heinrich has filed a

motion for summary judgment, seeking to reverse the Commissioner's final decision or remand the

case for reconsideration. The commissioner has also filed a motion for summary judgment seeking

to uphold the commissioner's decision. For the reasons set forth, Ms. Heinrich's motion is denied

[dkt. 12] and the commissioner's motion is granted [dkt. 15].

### I.      Procedural History

Ms. Heinrich filed a Title II application for a period of disability and disability insurance

benefits on September 9, 2009, alleging that her disability began on February 14, 2008.[2] Ms.

Heinrich filed a request for a hearing before an Administrative Law Judge ("ALJ")  on June 1,

---

[1] 42 U.S.C. § 416 (1).
[2] R. at 17.

2010.[3] Ms. Heinrich testified before the ALJ on June 9, 2011.[4] The ALJ issued an unfavorable

decision on June 15, 2011, concluding that Ms. Heinrich had not been disabled from February 14,

2008, through the date of the decision.[5] Ms. Heinrich filed a Request for Review of Hearing

Decision on June 24, 2011,[6] which was denied by the Appeals Council on May 7, 2012, making this

the final decision of the Commissioner.[7]

## II.    Factual Background

The facts set forth below are derived from the administrative record. Ms. Heinrich was born

June 3, 1965.[8] She was forty-five years old when she filed for disability benefits.[9] Ms. Heinrich lists

several ailments in her applications for benefits, including: degenerative disc disease, spinal stenosis,

and obesity. For all of these conditions Ms. Heinrich was treated by numerous health care

professionals over an extended period of time. Therefore, our review will be configured into the

following chronological periods: (1) first known office visits for her back pain until her alleged

onset of disability, which was from 1997 - February 14, 2008; (2) the onset of her disability until

the 2010 surgery, which was from February 14, 2008 – February 11, 2010, and; (3) post-surgery

until the ALJ hearing, which was from February 12, 2010 - June 9, 2011.

---

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] R. at 12-13.
[7] R. at 1.
[8] R. at 36.
[9] R. at 17.

1.      **First Known Office Visits for Back Pain until Alleged Onset of Disability:**

**1997 - February 14, 2008**

Ms. Heinrich listed in her disability report that she was treated by Robert Passavoy, M.D., from 1997-2008, for pain control.[10] Ms. Heinrich also mentioned in the report that Dr. Passavoy diagnosed her with spinal stenosis, a narrowing of the space within the vertebrae,[11] at some point between 1997 and 2005.[12] Additionally, a reference is made to a 2005 surgery to remove part of Ms. Heinrich's disk in her lower back.[13] However, Ms. Heinrich did not provide any of these early treatment or surgical records for the purposes of her present disability application.

2.      **Period from Alleged Onset of Disability to Surgery (February 14, 2008 –**

**February 11, 2010)**

Ms. Heinrich claimed her disability began on February 14, 2008.[14] However, the medical records do not begin until June 2009, when Ms. Heinrich was initially treated at the Grundy County Pain Center by Parveen Varma, M.D.[15] There is no explanation as to why Ms. Heinrich waited until September 2009, over one year after her disability began, before applying for disability. These first records indicate that Ms. Heinrich had lower back pain that radiated down to her left foot.[16] She also experienced pain when she rose from a sitting position, but she was "more or less" comfortable in

---

[10] R. at 172.
[11] McGraw-Hill Dictionary of Scientific and Technical Terms 2029 (6th ed. 2003).
[12] R. at 173.
[13] R. at 353.
[14] R. at 17.
[15] R. at 280.
[16] *Id.*

a seated position.[17] Dr. Varma recommended a physical therapy evaluation to evaluate range of motion.[18]

The next month, Bradley Immel, D.C., evaluated Ms. Heinrich.[19] Dr. Immel noted that Ms. Heinrich could perform normal daily activities without significant lower back pain, although she continued to have mobility restrictions.[20] She then went back to Dr. Varma on August 4, 2009, and September 14, 2009.[21] Ms. Heinrich stated that overall, her lower back pain had improved but she still had pain on the left side of her lower back and left buttock.[22] Dr. Varma noted that Ms. Heinrich's back pain was possibly due to degenerative changes at her sacroiliac joint, the segment of the vertebral column that forms part of the pelvis,[23] and recommended physical therapy and a back brace.[24]

The following month, Dr. Varma's notes indicated that the back brace enabled Ms. Heinrich to sit, stand, and walk without significant trouble, and her pain had decreased.[25] On a follow up visit on September 29, 2009, Ms. Heinrich's lower back was tender, but there was no swelling or discoloration.[26] Dr. Varma gave Ms. Heinrich a non-steroid injection at two different locations to alleviate pain caused by disc dysfunction in those areas, after which Ms. Heinrich reported no pain in the area.[27]

---

[17] R. at 280.
[18] R. at 281.
[19] R. at 306.
[20] *Id.*
[21] R. at 296-297.
[22] R. at 297.
[23] Stedman's Medical Dictionary 1714 (28th ed. 2007).
[24] R. at 297.
[25] R. at 298.
[26] R. at 299.
[27] *Id.*

Ms. Heinrich was also evaluated by her family doctor, Allison Verenna, M.D., that same day who recommended Ms. Heinrich to an Orthopedist, William Earman, D.O.[28] Dr. Earman evaluated Ms. Heinrich on October 19, 2009, noting signs of degenerative disc disease, which is disc deterioration associated with age,[29] in her lower back.[30]

Soon after applying for benefits, on November 2, 2009, state agency medical consultant Lenore Gonzalez, M.D., performed a physical residual functional capacity assessment on Ms. Heinrich.[31] Dr. Gonzalez found that Ms. Heinrich could stand, walk, or sit six hours in an eight-hour workday and exhibited no muscular atrophy.[32]

Pursuant to a referral from her orthopedist, Ms. Heinrich was seen next by Kanchan Patel, M.D., a pain specialist, on November 4, 2009.[33] Ms. Heinrich described her pain as a three out of ten on a pain scale.[34] Dr. Patel also noted that Ms. Heinrich was taking 100 mg of pain medication twice per day and had a history of morbid obesity.[35] Ms. Heinrich again visited Dr. Patel on December 2, 2009, who noted that Ms. Heinrich slept six to eight hours per night and exhibited no numbness in her extremities.[36] He advised her to gradually resume her regular activities.[37]

### 3. Surgery until ALJ Hearing: February 12, 2010 – June 15, 2011

In February Ms. Heinrich went back to her orthopedist, Dr. Earman, who performed a surgical fusion of four of Ms. Heinrich's vertebrae to address her stenosis and degenerative disc disease in

---

[28] R. at 353.
[29] McGraw-Hill Dictionary of Scientific and Technical Terms 565 (6th ed. 2003).
[30] R. at 544.
[31] R. at 324-331.
[32] R. at 325.
[33] R. at 343-344.
[34] Id.
[35] Id.
[36] R. at 340-341.
[37] Id.

those areas.[38] There were no complications reported.[39] Furthermore, the discharge instructions did not mention any specific restrictions or instructions other than to rest at home.[40] She was released from the hospital on February 15, 2010.[41]

Ms. Heinrich's pain and activity levels improved during the first three months following her surgery. During her February 22 appointment, Ms. Heinrich stated that her pain was decreasing and she was increasing her activities.[42] Dr. Earman also noted that Ms. Heinrich exhibited good strength.[43] Dr. Earman's notes from Ms. Heinrich's March visit indicate that she had been gradually increasing her activities; Dr. Earman advised Ms. Heinrich to continue to increase her activities and planned to lower her medications.[44]

Then, though there is no recorded office visit on April 22, 2010, Dr. Earman's notes indicate that he wrote a note for Ms. Heinrich, at her request.[45] This note prohibited her from working for six months.[46]

Another state medical consultant, France Vincent, M.D., completed a second residual functional capacity assessment in May 2010. Dr. Vincent simply affirmed what the previous state medical consultant had found; that Ms. Heinrich was capable of light work between November 2009 until the February 2010 surgery.[47] He also estimated that her current limitations would not last more

---

[38] R. at 389-391.
[39] R. at 391.
[40] R. at 548.
[41] R. at 394.
[42] R. at 399.
[43] *Id.*
[44] R. at 397.
[45] R. at 530.
[46] *Id.*.
[47] R. at 411-421.

than twelve months, at which time she would able to sustain sedentary work as described in this assessment.[48]

Ms. Heinrich went back to her family doctor, Dr. Verenna, on May 28, 2010 and June 17, 2010.[49] Ms. Heinrich mentioned that the radiation of pain into her lower extremities had improved, but she was still experiencing lower back pain.[50] Dr. Verenna encouraged her to monitor her diet and continue her current level of activity.[51] Dr. Verenna also noted that Ms. Heinrich was morbidly obese but exhibited normal range of motion without pain and good motor strength.[52]

A month later, Ms. Heinrich requested a second, and then a third letter from her orthopedist. Again, Ms. Heinrich was not seen by Dr. Earman on July 1, 2010, but the record indicates that Dr. Earman provided Ms. Heinrich, upon her request, with a note stating that she could return to work as soon as possible.[53] Not even a month later, Dr. Earman provided her with a third note, upon her request, stating that she could not work more than four hours per day, and never on consecutive days.[54]

On September 16, 2010, Ms. Heinrich was examined by Scott Ciechna, M.D., where she exhibited no acute pain.[55] This was Ms. Heinrich's first visit with Dr. Ciechna, and it is not clear who referred her to his office. The following year, Ms. Heinrich was again seen by Dr. Ciechna on March 16, 2011, complaining of lower back pain and fatigue.[56] Regarding Ms. Heinrich's fatigue, Dr. Ciechna noted that Ms. Heinrich's blood test from six months prior returned with completely normal

---

[48] R. at 421.
[49] R. at 423, 502.
[50] R. at 423.
[51] *Id.*
[52] R. at 502.
[53] R. at 529.
[54] R. at 527.
[55] R. at 505.
[56] R. at 507-509.

results.[57] Additionally, Dr. Ciechna noted that Ms. Heinrich exhibited mild back tenderness, and refilled her muscle relaxers.[58]

In February 2011, one year after her surgery, Ms. Heinrich returned to her orthopedist, Dr. Earman.[59] He noted that Ms. Heinrich was still experiencing some lower back pain, although the pain was no longer radiating, and she was otherwise stable.[60] Several months later, Dr. Earman completed a physical residual functional capacity questionnaire for Ms. Heinrich's social security disability claim.[61] He noted that Ms. Heinrich could only sit for forty-five minutes at a time, stand for thirty minutes at a time, was only capable of low stress jobs, and could only sit and stand for a combined total of four hours per working day.[62] He also noted that Ms. Heinrich would likely be absent from work four days per month as a result of her impairments.[63]

There are no additional medical records prior to Ms. Heinrich's hearing before the ALJ. The month before, however, we know Ms. Heinrich went to the Morris Hospital Emergency Room complaining of lower back pain.[64]

## III.    ALJ Hearing and Opinion

The ALJ hearing took place on June 9, 2011.[65] Ms. Heinrich was forty-six years old at the

---

[57] Id.
[58] Id.
[59] R. at 512.
[60] Id.
[61] R. at 484-489.
[62] R. at 485-486.
[63] R. at 487.
[64] R. at 548.
[65] R. at 17.

time. Ms. Heinrich, and Mr. Brady, the Vocational Expert ("VE"), testified at the hearing.[66] Ms.

Heinrich was represented by her attorney, Jared Cook.[67]

### 1.      Ms. Heinrich's Testimony

Heinrich began by testifying about her previous employment as a cashier for Osco.[68] She

claimed to have quit because she could no longer stand because of her lower-back pain.[69] Next, Ms.

Heinrich described her inability to sit and stand for longer than thirty minutes at a time.[70] Ms.

Heinrich also listed the medications she was taking: Fentanyl pain patch, the anti-inflammatory

Nevimatone, Flexeril, Ibuprofen, and Xanax to help her sleep at night when the pain was more

severe.[71] When questioned by the ALJ about her daily activities, Ms. Heinrich stated that she takes

care of her four year old granddaughter.[72] Ms. Heinrich also commented that she used the computer

for general uses and goes shopping with her son.[73]

Ms. Heinrich next spoke about her decision not to attend physical therapy and to quit the

gym. Ms. Heinrich  felt that she did not need physical therapy at the time, although she also stated

that she could  not walk because she felt like someone was twisting her spine.[74] Ms. Heinrich

attempted to exercise at the gym, but she was unable to do so because of her pain.[75] Ms. Heinrich then

testified that she experienced sleepiness, nausea, and dizziness as side effects from her medications.[76]

Next, Ms. Heinrich stated that her current pain level was the same as it was prior to her

---

[66] *Id.*
[67] *Id.*
[68] R. at 37.
[69] *Id.*
[70] *Id.*
[71] R. at 38.
[72] R. at 38-39.
[73] R. at 39.
[74] R. at 40.
[75] R. at 40-41.
[76] R. at 41.

surgery, and she still experienced some pain and numbness in her leg.[77] Ms. Heinrich also testified

that she visited the emergency room on May 17, 2010, because her pain was so intense.[78] She had

been performing normal activities at the time, but her pain prevented her from standing, sitting,

walking, and her medications did nothing to alleviate the pain.[79] In addition to receiving an increased

dose of her fentanyl pain patch, Ms. Heinrich also mentioned that she experienced muscle spasms

each day that sometimes lasted for the entire day and prevented her from sleeping at night.[80]

Later, Ms. Heinrich testified that she spends at least three to four hours per eight hour work

day lying down.[81] Additionally, Ms. Heinrich testified that she had used a back brace in the past, but

does not currently use one.[82] Ms. Heinrich then stated that she prepares two meals per week, for

fifteen to thirty minutes at a time, with her husband's assistance.[83] Lastly, Ms. Heinrich stated that

she cannot sweep, vacuum, or clean and fold laundry because of her ailments.[84]

### 2. VE's Testimony

Next, Mr. Brady, the VE, testified.[85] The ALJ asked the VE a series of hypothetical questions

regarding an individual of the same age, education, and past work experience as Ms. Heinrich.[86] The

ALJ also specified that such an individual would be limited to sedentary work, lifting ten pounds

occasionally, less than ten frequently, sitting six of eight hours in a typical work day, and could stand

---

[77] *Id.*
[78] R. at 43.
[79] *Id.*
[80] R. at 43-44.
[81] *Id.*
[82] R. at 45.
[83] *Id.*
[84] R. at 46.
[85] *Id.*
[86] R. at 48.

and walk up to two hours in an eight hour workday.[87] When asked if such an individual could perform

any of Ms. Heinrich's past work, the VE responded that he believed such an individual could return

to a data entry clerk position and the appointment clerk position.[88] Additionally, the VE stated that

such an individual could perform the following jobs: information clerk, order clerk, and call out

operator.[89] The VE also testified that some of these jobs would be available to an individual with the

limitations from the hypothetical where there was the option to alternate between sitting and standing

for thirty minute periods.[90]

The VE also stated, when questioned by Ms. Heinrich's attorney, that an individual who could

only sit for forty-five minute periods for a total of four hours and stand up to thirty minutes for two

hours, would not be able to perform full time work activity.[91] The VE then stated that an individual

who would miss three to four days per month, as Dr. Earman's RFC asserted, would not be able to

maintain any employment.[92]

### 3.     ALJ's Decision

In an opinion issued June 15, 2011, the ALJ concluded that Ms. Heinrich was not disabled

within the meaning of the Social Security Act, both in terms of a period of disability and disability

insurance benefits, from February 14, 2008, through the date of the decision.[93]

Social security regulations require all ALJs to follow a five-step sequential process to

determine whether or not an individual is disabled.[94] The burden of proof rests with the complainant

---

[87] *Id.*
[88] *Id.*
[89] R. at 49.
[90] *Id.*
[91] R. at 50.
[92] R. at 51.
[93] R. at 17.
[94] 20 C.F.R. § 404.1520 (a).

in steps 1-4 to prove she is disabled; if she meets this burden, then the burden shifts to the ALJ in step five to prove that the complainant is capable of other work, based upon her age, RFC, and work experience, within the economy.[95] First, the ALJ must determine whether the claimant is presently engaged in substantial, gainful activity; if so, this precludes a finding of disability.[96] In the present case, the ALJ found that Ms. Heinrich had not engaged in substantial gainful activity since the alleged onset date of February 14, 2008.[97]

At step two, the ALJ must determine whether the claimant has a "severe" impairment or combination of impairments.[98] An impairment is considered "severe" if it significantly interferes with a person's ability to perform basic work activities.[99] In the present case, the ALJ found that Ms. Heinrich had the following severe impairments: status post discectomy, decompression laminectomy and spinal fusion of the lumbar spine, and obesity.[100] The ALJ also found that these impairments more than minimally impacted Ms. Heinrich's ability to perform basic work activities.[101]

The ALJ's third step is to consider whether the claimant's impairment or combination of impairments meets the criteria of a listing in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR 404.1520(d), 404.1525, and 404.1526.[102] The ALJ determined that the evidence did not document a listing-level severity and that no "acceptable" medical source listed mentioned findings that were equivalent in severity to any listed impairment or combination of impairments.[103]

---

[95] 20 C.F.R. § 404.1520 (a)(4)(v).
[96] R. at 18.
[97] R. at 19.
[98] 20 C.F.R. § 404.1572 (c).
[99] *Id.*
[100] R. at 19.
[101] *Id.*
[102] 20 C.F.R. Part § 404, Subpart P, Appendix 1. 20; 20 C.F.R. §§ 404.1520 (d), 404.1525, and 404.1526.
[103] R. at 20.

If no impairments are found that meet the social security regulations listing requirements, the ALJ must proceed to the fourth step to determine whether Ms. Heinrich has the residual functional capacity ("RFC") to perform the requirements of past relevant work.[104] An RFC is an assessment of the maximum work related activities the complainant, with her limitations, can complete.[105] If Ms. Heinrich has the residual functional capacity to perform past relevant work, Ms. Heinrich is not disabled.[106]

When the ALJ must assess the complainant's subjective complaints in order to determine the RFC, the ALJ must follow a two-step process.[107] First, the ALJ must determine whether there is an underlying impairment that can reasonably be accepted, based upon medical evidence, to cause the symptoms alleged.[108] If so, the ALJ must evaluate how the intensity and persistence of the symptoms affect the claimant's ability to work.[109]

Here, the ALJ found that Ms. Heinrich had the RFC to perform sedentary work as defined by 20 CFR 404.1567(a).[110] However, the ALJ also noted that Ms. Heinrich can never climb ladders, ropes, scaffolds, ramps or stairs; she may only occasionally balance, stoop, kneel, crouch and crawl and she must avoid concentrated exposure to hazards.[111] The ALJ found that Ms. Heinrich's medically determinable impairments could be expected to cause her symptoms but found her statements regarding the intensity, persistence, and limiting effects of the symptoms were not

---

[104]  20 C.F.R. § 404.1520 (a)(4)(iv); S.S.R. 82-61.
[105] *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a).
[106] 20 C.F.R. § 404.1520(a)(4)(iv).
[107] 20 C.F.R. § 404.1545(a).
[108] 20 C.F.R. § 404.1545(b).
[109] 20 C.F.R. § 404.1545(c).
[110] R. at 20.
[111] *Id.*

credible.[112]

In his credibility determination, the ALJ highlighted inconsistencies between Dr. Earman's office notes between February 2010 and May 2011 and the ALJ hearing, and the RFC questionnaire Dr. Earman filled out in April 2011 regarding how many days per week and how long each day Ms. Heinrich was capable of sitting and standing.[113] Additionally, Ms. Heinrich's work history report, completed nearly two years after her alleged onset date, did not support Ms. Heinrich's statements regarding her physical limitations due to pain; Ms. Heinrich wrote that she stood six hours during her twelve hour shifts as a cashier during the alleged disability period.[114]

Next, the ALJ specifically pointed to three notes Dr. Earman wrote, each of which were written at the request of Ms. Heinrich or her attorney.[115] One stated she could not work for six months, another written three months later provided that she could return to work immediately.[116] Then a third note, written only weeks later, stated that Ms. Heinrich could only work four hours per day and never on consecutive days.[117]

The ALJ gave limited weight to the residual functional capacity assessment completed by Dr. Gonzalez in November 2009.[118] The state agency doctor concluded that Ms. Heinrich was capable of performing the requirements of light work between November 2009 and February 2010.[119] However, the ALJ found that Ms. Heinrich's allegations and medical records during this period supported additional limitations; specifically, the ALJ noted that Ms. Heinrich was "limited to less

---

[112] R. at 21.
[113] R. at 26 (*referring to* R. at 512-520, 483-489).
[114] R. at 26 (*referring to* R. at 236-242).
[115] R. at 26 (*referring to* R. at 527-531).
[116] *Id.*
[117] *Id.*
[118] R. at 25 (*referring to* R. at 324-331).
[119] R. at 25 (*referring to* R. at 413).

than the full range of sedentary work" prior to the February 2011 Surgery.[120]

However, the ALJ gave some weight to the second residual functional capacity assessment issued by state agency medical consultant, Dr. Vincent, in May 2010.[121] Dr. Vincent had concluded that Ms. Heinrich would be able to sit for six hours and stand less than two hours in an eight hour workday by February 2011, one year after her recent surgery.[122] But the ALJ noted that Ms. Heinrich recovered much sooner than Dr. Vincent estimated. To support this point, the ALJ referenced Dr. Verenna, Ms. Heinrich's treating physician, who noted on June 17, 2010, that Ms. Heinrich only exhibited mild tenderness, denied any numbness, and exhibited a full range of motion.[123] Therefore, after evaluating the record in its entirety, the ALJ found Ms. Heinrich capable of performing sedentary work.**[124]**

## IV. Standard of Review

The Court must sustain the Commissioner's findings of fact that are supported by substantial evidence and free from legal error.[125] Substantial evidence is more than a "scintilla" of proof: it is "what a reasonable mind might need to support a conclusion."[126] The Court must review the entire record, but it "will not decide the facts anew, re-weigh evidence, or substitute our judgment for that of the ALJ."[127] Additionally, where conflicting evidence allows for alternative reasonable conclusions, it is the Commissioner's responsibility to determine whether the plaintiff is disabled,

---

[120] R. at 25 (*referring to* R. at 411-413).
[121] *Id.*
[122] *Id.*
[123] R. at 25 (*referring to* R. at 502).
[124] *Id.*
[125] 42 U.S.C. § 405 (g).
[126] *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).
[127] *Butera v. Apfel*, 173 F.3d 1049,1055 (7th Cir. 1999).

not the Court.[128] Although the ALJ does not have to discuss every piece of evidence, she must still articulate, at a minimum level, her analysis of the evidence[129] and  "build a logical bridge" between the evidence and his conclusion.[130]

## V.      Analysis

Ms. Heinrich proffers the following three arguments for remand: (1) the ALJ did not give adequate weight to Dr. Earman's medical opinion; (2) the ALJ failed to consider all statutorily relevant factors when he determined Ms. Heinrich's credibility, and; (3) the ALJ failed to consider that Ms. Heinrich would not be able to perform sedentary work because of her ailments. For the reasons set forth below, we uphold the Commissioner's findings.

### 1.      The Weight Given to Dr. Earman's Opinion

We begin with an assessment of the weight the ALJ gave to Dr. Earman's opinion. Ms. Heinrich claims that had the ALJ given Dr. Earman's opinion proper weight, it would have been clear that she could not perform even sedentary work. Specifically, Ms. Heinrich describes an  inability to maintain employment because of her inability to work more than four days per week, referring to Dr. Earman's April 2011 RFC questionnaire.[131] We find there is sufficient evidence in the record to support the ALJ's determination that Dr. Earman's "own treatment notes do not support the level of limitations he described in his report on April 10, 2011."[132]

Social security regulations state that "a treating physician's opinion is entitled to controlling weight when it is supported by the medical evidence and is not inconsistent with other substantial

---

[128] *Walker v. Bowen*, 834 F.2d 635, 640 (7th Circ. 1987).
[129] *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Brindisi ex. Rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).
[130] *McKenzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).
[131] Pl.'s M. Summ. J. at 16 (*referencing* R. at 483-489).
[132] R. at 25.

evidence."[133] When the treating physician's opinions are "not consistent with other substantial evidence," the presumption that the treating physician's opinions are entitled to controlling weight disappears.[134] Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[135]

Here, the ALJ found two inconsistencies. First, the ALJ referenced Dr. Earman's notes from Ms. Heinrich's multiple offices visits in February, March, and May of 2011 where Dr. Earman repeatedly noted that Ms. Heinrich had good motor strength, no neurological deficits, and negative straight leg testing.[136] The ALJ also highlighted an office visit from February 2011, two months prior to the ALJ hearing, where Dr. Earman wrote that an x-ray indicated a solid fusion in Ms. Heinrich's lumbar spine and that she was stable on her medications.[137] The ALJ gave credit to these notes.

The ALJ discounted, however, the last medical record that Dr. Earman completed, which was an RFC questionnaire specifically filled out for Ms. Heinrich's disability application. Dr. Earman listed numerous limitations in the RFC questionnaire, such as the inability to work more than four days per week.[138] The ALJ found Dr. Earman's answers regarding Ms. Heinrich's limitations inconsistent with his examination notes because Dr. Earman had noted in February 2011, two months before he filled out the questionnaire, that Ms. Heinrich was stable on her medications and that her lumbar spine showed a solid fusion.[139] The ALJ also pointed out that Dr. Earman showed few objective findings to support Ms. Heinrich's allegations of disabling pain,[140] a point the

---

[133] 20 C.F.R. § 404.1527 (c)(2).
[134] *Hofslien v. Barnahrt*, 439 F.3d 375, 377 (7th Cir. 2006).
[135] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
[136] *Id.* (*quoting* R. at 397-399, 423).
[137] R. at 26 (*quoting* R. at 484-487).
[138] R. at 486.
[139] R. at 25 (*referring to* R. at 512).
[140] R. at 25

Commissioner highlighted in his motion for summary judgment.[141] Thus, the inconsistencies between Dr. Earman's treatment notes and the RFC questionnaire lead the ALJ, in part, to discount Dr. Earman's opinion.[142]

Ms. Heinrich also argues that the ALJ's evaluation of Dr. Earman's opinion was inconsistent with social security regulations granting the treating physician's opinion controlling weight[143] and the Seventh Circuit's decision in *Elder v. Astrue*.[144] It is odd that Ms. Heinrich proffers *Elder* to support her position because in that case the appellate court found that the ALJ had correctly given little weight to the treating physician's opinion.[145] Much like this case, in fact, the court found that a decision to deny a treating physician controlling weight does not prevent the ALJ from considering it, or affording it less evidentiary weight.[146] The ALJ is to simply discuss factors, such as the extent of the relationship, whether the physician's opinions included sufficient explanations, and the physician's specialization.[147]

Here, the ALJ reviewed Dr. Earman's treatment notes, which appeared inconsistent with the level of limitations he ultimately described in his April 2011 report,[148] and inconsistent with other substantial evidence in the record; for example, Dr. Verenna's notes regarding her recovery[149] and Dr. Vincent's assessment.[150] The only doctor notes that reflected the level of limitations Ms. Heinrich claims are those written "based on her requests" and within the residual functional capacity

---

[141] D.'s M. Summ. J. at 6 (*referring to* R. at 395-409, 422-424, 510-545).
[142] R. at 25.
[143] 20 C.F.R. § 404.1527 (c)(2).
[144] 529 F.3d 408, 415 (7th Cir. 2008).
[145] *Elder*, 529 F.3d at 415.
[146] *Id.*
[147] *Id.*
[148] R. at 25 (*referring to* R. at 512-535).
[149] *Id.* (*referring to* R. at 502).
[150] *Id.* (*referring to* R. at 411-413).

questionnaire.[151] The ALJ, therefore, explained why he found Dr. Earman's ultimate opinion on Ms. Heinrich's abilities to be inconsistent. As noted in *Elder*, if the ALJ discounts a physician after considering these issues, "we must allow that decision to stand," which is "'a very deferential standard that we have, in fact, deemed 'lax.'"[152]

Moving to the second inconsistency the ALJ referenced, we must address the three work limitation notes. Ms. Heinrich argues that the ALJ inappropriately determined that Dr. Earman only wrote the work limitation notes because of Ms. Heinrich's requests, "not his medical opinion."[153] She relies on *Ratto v. Secretary*, a Ninth Circuit case, for the proposition that the Commissioner cannot assume that a doctor will routinely lie in order to help patients collect disability benefits.[154] In *Ratto*, the court found that the ALJ had incorrectly rejected the findings of a doctor because the examination was procured by the claimant and incorrectly assumed that the doctor's findings were tainted because he knew the claimant was applying for benefits.[155] The court held that such knowledge does not automatically make the doctor biased, finding that the Commissioner may only "introduce evidence of actual improprieties."[156]

But here Dr. Earman wrote three conflicting notes in three months, the last note within three weeks of the second note, each at the request of Ms. Heinrich or her attorney. Even if we apply the court's reasoning in *Ratto*, which is not binding here, Ms. Heinrich's argument fails because there is no medical evidence or explanation provided for Dr. Earman's conflicting notes within a four

---

[151]R. at 25.
[152]*Elder*, 529 F.3d at 415(quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).
[153] Pl.'s M. Summ. J. at 13.
[154] 839 F. Supp. 1415, 1426 (D. Or. 1993).
[155] *Id.*; *see Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1996)(holding the ALJ's suspect opinion of the claimant's psychologist inappropriate because his opinion was obtained in anticipation of litigation).
[156] *Id.*

month period of time. Pursuant to our standard of review, the ALJ's reliance on this kind of inconsistency is sufficient, and allows the ALJ to afford Dr. Earman less weight.

### 2.     The ALJ's Assessment of Ms. Heinrich's Credibility

Ms. Heinrich alleges that the ALJ incorrectly discounted her statements because the ALJ did not list all the statutorily relevant factors in his credibility section: Ms. Heinrich's daily activities; location, duration, and frequency of pain; factors that precipitate and aggravate symptoms; side effects of any medication Ms. Heinrich takes, and any other factors concerning Ms. Heinrich's limitations due to pain.[157]

When assessing credibility, SSR 96-7P states that the ALJ's written decision must "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[153] Where conflicting evidence allows for different reasonable findings as to whether a claimant is disabled, the ALJ's opinion is controlling if supported by substantial evidence.[154] Additionally, the claimant must show that the ALJ's credibility determination was "patently wrong" for this court to overturn it.[155] However, the ALJ must still build a "logical bridge"[156] between the evidence and his conclusion. Lastly, the ALJ's opinion cannot stand if it is "so poorly articulated as to prevent meaningful review."[157]

---

[157] *See* 20 C.F.R. § 404.1529 (c) (providing factors necessary to evaluate a claimant's credibility).
[153] SSR 96-7p; *see* also *Brindisi ex. Rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).
[154] 42 U.S.C. § 405(g); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).
[155] *See Powers v.Apfel*, 207 F.3d 431,435 (7th Cir .2000).
[156] *Craft v. Astrue*, 539 F.3d 668,673 (7th Circ. 2008).
[157] *Id.*

All of the factors Ms. Heinrich believes the ALJ did not consider are, in fact, given consideration in different sections of the ALJ's opinion. First, the ALJ discussed Ms. Heinrich's daily activities.[158] Specifically, the ALJ noted that Ms. Heinrich alleges that she sleeps three to four hours per day[159] and takes care of her three year old granddaughter, occasionally goes grocery shopping, and uses the computer to stay in touch with friends.[160] However, the ALJ determined that, as of the June 2011 ALJ hearing, Ms. Heinrich had recovered to the extent that she could perform sedentary work because of the lack of objective findings to the contrary, the omission in the record of significant complaints of fatigue, and due to a work history report that indicated she would stand for six hours out of a twelve-hour shift.[161] Ms. Heinrich offers no case law or citations from the record to support her argument that the ALJ's assessment was incorrect.

Second, the ALJ wrote at great length about the location, duration, intensity, and frequency of Ms. Heinrich pain, the multiple doctors she visited, and the treatments she underwent.[162] The ALJ summarized Ms. Heinrich's office visits, medical notes and procedures from 2008 until June 9, 2011, and her testimony.[163] The ALJ specifically noted Ms. Heinrich's claim that she had daily muscle spasms that could last all day.[164] The ALJ determined after review of Ms. Heinrich's testimony, and the testimony of the VE, that Ms. Heinrich's ailments had improved between February 2010 and the ALJ hearing because of Dr. Verenna's office notes from July 2010, which stated that Ms. Heinrich displayed mild tenderness and exhibited a full range of motion without pain[165] and Dr. Vincent's

---

[158] R. at 21.
[159] R. at 26.
[160] R. at 21.
[161] R. at 26.
[162] R. at 22-25.
[163] R. at 21-25.
[164] R. at 21.
[165] R. at 23 (*referring to* R. at 502).

assessment from May 2010, which stated that Ms. Heinrich would be able to perform sedentary work as of February 2011.[166] Therefore, the ALJ provided a logical bridge between his findings and the record when he made his determination.

Third, the ALJ mentioned factors that aggravated and precipitated Ms. Heinrich's symptoms. In the medical history section of his report, the ALJ noted that Ms. Heinrich has difficulty "walking, lifting, bending, and sitting" as of January 2010, referring to Ms. Heinrich's back injury.[167] Additionally, the ALJ highlighted that Ms. Heinrich's ability to perform these actions without aggravating her symptoms had improved; Dr. Verenna's notes from a June 2010 visit indicate that Ms. Heinrich exhibited a full range of motion without pain.[168]

Fourth, the ALJ discussed the alleged effects of Ms. Heinrich's medications, but found them to be less than credible. First, the ALJ noted that Ms. Heinrich alleged that she experiences sleepiness and nausea due to her medications.[169] The ALJ concluded, however, that "the medical record does not indicate the claimant ever complained of nausea or dizziness."[170] Second, the ALJ noted that Ms. Heinrich alleged that she experiences fatigue due to her medications. However, the record only indicated that she told Dr. Ciechna once about her fatigue.[171] Dr. Ciechna specified that Ms. Heinrich's blood had been tested six months prior to her complaint of fatigue with completely normal results.[172] Additionally, the ALJ accurately pointed out that, with the exception of this visit, there was no evidence in the record that Ms. Heinrich ever complained of fatigue again to any of her doctors.[173]

---

[166] R. at 23 (*referring to* R. at 421).
[167] *Id.*
[168] R. at 23 (*referring to* R. at 502).
[169] R. at 26.
[170] *Id.*
[171] R. at 26 (*referencing* R. at 507-508).
[172] *Id.*
[173] R. at 26.

Ms. Heinrich also fails to provide case law, or cite any evidence from the record, that would discount the ALJ's determination regarding the alleged effects of her medications.

Fifth, Ms. Heinrich also argues that the ALJ improperly considered the extent to which her pain limits her ability to stay on task. Ms. Heinrich accurately points out that once there is a medically determinable impairment that reasonably could produce the pain, but the intensity of the pain is unsubstantiated by the record, the ALJ must consider the observation of all physicians, third party testimony, and her activities and restrictions.[174] However, Ms. Heinrich does not explain why the ALJ's thorough consideration of all these factors does not satisfy the standard in *Herron v. Shalala*,[175] a case she cites to support her argument. In *Herron*, the ALJ failed to make any assessment of the medical evidence and testimony regarding one of the claimant's injuries.[176] But here, the ALJ discussed his assessment of all  relevant medical evidence and Ms. Heinrich's testimony. Specifically, the ALJ highlighted the weight given to the assessments produced by  Dr. Vincent and Dr. Gonzalez,[177] and Dr. Earman, and Ms. Heinrich's credibility assessment.[178] While the ALJ's opinion does not contain a separate section where he considers the opinions of  Dr. Ciechna, Dr. Varma, or Dr. Verenna, the ALJ  mentioned their findings throughout the opinion; the ALJ cited Ms. Heinrich's June 2010 office visit with Dr. Verenna where she exhibited a full range of motion without pain,[179]  summarized Dr. Varma's findings from visits in June 2009 and August 2009,[180] and  listed Dr. Patel's notes the from examinations in November and December of 2009.[181]

---

[174] 20 C.F.R. § 404.1529; *Herron v. Shalala*, 19 F.3d. 329, 334 (7th Cir. 1994).
[175] *Herron*, 19 F.3d at 333-337.
[176] *Id.*
[177] R. at 25.
[178] R. at 25-26.
[179] R. 23 (*referring to* R. at 502).
[180] R. at 21-22 (*referring to* R. at 280, 296-297).
[181] R. at 22 (*referring to* R. at 343-350).

Finally, Ms. Heinrich argues that the ALJ did not consider her work history.[182] Ms. Heinrich makes numerous accusations about the ALJ's incorrect consideration of her work history,[183] despite providing only a single citation to the ALJ's decision to support her argument. Contrary to her contention, however, the ALJ analyzed Ms. Heinrich's work history at great length.[184] The ALJ supported his conclusion that Ms. Heinrich is capable of "performing past relevant work"[185] by providing a detailed analysis of Ms. Heinrich's work history, Dr. Vincent's residual functional capacity assessment, and a summary of the VE's answers.[186]

### 3.    Ms. Heinrich's Residual Functional Capacity

Ms. Heinrich's final argument is that the ALJ failed to consider that, due to her job history and physical limitations, she is unable to perform the full range of sedentary work.[187] As noted, she principally relies on support from her orthopedist, Dr. Earman, who found that she is unable to work more than four hours per day and requires one day off per week. We have already determined that the ALJ was not in error when he discounted this particular assessment by Dr. Earman. Sedentary work is defined by social secuirty regulations as requiring primarily sitting, some walking and standing, and minimal lifting.[188] The Seventh Circuit has also noted that a claimant is capable of performing sedentary work if she can (1) sit up, (2) do occasional lifting of objects up to ten pounds, and (3) occasionally walk or stand.[189]

While it is true that Ms. Heinrich's medical record demonstrates a history of multiple back problems with degenerative disc disease, Dr. Earman's notes from Ms. Heinrich's office visits

---

[182] Pl's. M. Summ. J. at 19.
[183] *Id.*
[184] R. at 26-27.
[185] R. at 27.
[186] R. at 26-27.
[187] *See* 20 C.F.R. §§ 404.1520, 416.920; *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993).
[188] *See* 20 C.F.R. §§ 404.1567 (a), 416.967 (a).
[189] *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).

between her February 2010 surgery and the June 2011 ALJ hearing indicate that Ms. Heinrich was steadily improving, gradually increasing her daily activities, and her pain levels were slowly decreasing.[190] As previously noted, little weight was given to Dr. Earman's medical opinion in regards to the April 2011 questionnaire, but his notes prior to that date were relied on by the ALJ.[191] The ALJ also referenced the fact that Dr. Earman noted that he planned to cut back her medications.[192] Additionally, Dr. Verenna's notes indicate that as early as June 2010 Ms. Heinrich had no joint pain or stiffness, dizziness, numbness, and displayed a full range of motion while exhibiting only mild tenderness.[193]

Ms. Heinrich, however, contends that the ALJ incorrectly dismissed her documented complaints due to insufficient evidence of neurological deficits after her surgery. She argues that the court in *Montgomery v. Barnhart* required the ALJ to consider problems that ensued when an individual was "off task" for as long as fifteen minutes twice per month.[194] However, Ms. Heinrich fails to appreciate that the complainant in *Montgomery* had suffered head trauma, routinely experienced seizures, and that the ALJ had independently determined the complainant's limitations without articulating the basis for his findings.[195] In contrast, here the ALJ articulated that his determination regarding Ms. Heinrich's RFC was based upon the opinions of Dr. Vincent and Dr. Gonzalez, Dr. Earman's notes, and Ms. Heinrich's testimony.[196]

## VI.    Conclusion

---

[190] R. at 25-26 (*referencing* R. at 520-531).
[191] R. at 25.
[192] R. at 25-26 (*referencing* R. at 399).
[193] R. at 23 (*referencing* R. at 502).
[194] No. 02 C 7564, 2004 U.S. Dist. LEXIS 14287, at *16-18 (July 26, 2004, N.D. Ill.).
[195] *Id.*
[196] R. at 25-26.

For the reasons outlined, Ms. Heinrich's motion for summary judgment is denied [dkt. 12] and the Commissioner's motion is granted [dkt. 15].

**IT IS SO ORDERED.**

Date: August 23, 2013

Susan E. Cox
U.S. Magistrate Judge